[Cite as *In re J.A.*, 2024-Ohio-5380.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: J.A.
    J.D.-A.

C.A. Nos.    31076
                31077

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE Nos.    DN 22 03 0270
                DN 22 03 0273

DECISION AND JOURNAL ENTRY

Dated: November 13, 2024

FLAGG LANZINGER, Judge.

{¶1} Appellant, C.A. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed his two minor children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2} Father is the biological father of J.A., born February 17, 2010; and J.D.-A., born December 28, 2006. The children's mother ("Mother") resided in Texas throughout this case, did not maintain consistent contact with the children or CSB, and ultimately conceded that she was not prepared to provide the children with a stable home. Mother was represented by counsel, but did not appear at the final hearing and has not appealed from the trial court's judgment.

{¶3} Several years ago, this family was involved with a children services agency in Texas, but few details about that case are included in the record. The children were removed from Mother's custody because of her ongoing substance abuse problems and failure to meet the children's basic needs. Father could not care for the children at that time because he was serving a three-year period of incarceration on an unspecified criminal conviction.

{¶4} The children were later placed with a paternal cousin ("Cousin"), who lives in Stark County, Ohio. After Father was released from incarceration, he relocated to Ohio to try to get his children back. The children were ultimately placed in his legal custody and the Texas case was closed. Father continued to rely on Cousin as part of his family support system.

{¶5} CSB filed complaints to allege that J.A. and J.D.-A. were neglected and dependent children because the family was homeless, and Father was suffering from mental health and substance abuse problems. CSB also expressed the agency's concern that the family dog had bitten the younger child, who walked to a restaurant to seek help, and Father could not be located. That child, J.A., was removed from Father's custody pursuant to Juv.R. 6 on March 11, 2022. The juvenile court removed J.D.-A. from Father's custody after CSB filed the complaints on March 14, 2022.

{¶6} The juvenile court later adjudicated both children neglected and dependent, placed them in the temporary custody of CSB, and adopted the case plan as an order of the court. Because Cousin was still involved with the family and was approved for placement, CSB placed the children in her home. J.A. was later relocated to a residential mental health treatment facility because he kept running away from Cousin's home, harmed one of Cousin's children, and had threatened to harm himself.

{¶7} In addition to demonstrating that he could provide the children with suitable housing and meet their other basic needs, the case plan required Father to engage in ongoing substance abuse and mental health treatment and demonstrate sustained sobriety and that he had stabilized his mental health. Father had been sporadically engaged in mental health services when this case began. He had been diagnosed with psychotic disorder, stimulant dependence, attention deficit hyperactivity disorder, anxiety, and suicidal ideation. Father did not believe that he suffered from psychotic episodes, however, and did not consistently take his psychiatric medications. Because of his unstable mental health, Father had a lengthy history of psychiatric hospitalizations.

{¶8} Pursuant to the case plan, Father engaged in substance abuse and mental health treatment, but did not consistently maintain sobriety or manage his mental health medications. Although Father tested positive for methamphetamine shortly before the one-year sunset date, the trial court granted CSB's motion for a six-month extension of temporary custody because Father was making some progress in treatment. Throughout this case, however, Father was in and out of different levels of drug treatment because he continually relapsed and used methamphetamine and/or amphetamine. Father did not maintain a sustained period of sobriety, and he failed to consistently take his prescribed antipsychotic medication.

{¶9} As a result of Father's extensive use of methamphetamine, his failure to take his prescribed antipsychotic medication, or the combined effect of both, Father often experienced auditory and visual hallucinations, including that people had drilled into his apartment walls in the middle of the night, were listening to him, and/or trying to break into his apartment or commit other crimes in his building. At several points during this case, Father became agitated and exhibited erratic and dangerous behavior when the police, his landlord, and/or psychiatric hospital personnel did not believe his irrational statements. Some of those incidents had also resulted in

Father harming or threatening to harm himself. Father was hospitalized in psychiatric wards twice during this case.

{¶10} On June 9, 2023, CSB moved for permanent custody of both children. Several months later, Father was involved in an incident in which he became paranoid, agitated, and violent after he had admittedly used methamphetamine. Father went to Mercy Hospital in Canton, apparently seeking help. Rather than going to the emergency room, however, he attempted to break through the locked glass entrance to offices that were closed at that time. Father broke some of the glass by punching it with his fist and hitting it with rocks. Father seriously cut himself, and then collapsed on the ground and began convulsing. Several hospital police officers intervened to assist and arrest Father and control the dog that was with him at the time. After Father received medical treatment at the hospital's emergency room, police officers arrested Father and transported him to the county jail. Father was later convicted of disorderly conduct and placed on community control.

{¶11} During the three to four months after the incident at Mercy Hospital, Father missed at least two drug screens that had been ordered by his probation officer and twice tested positive for methamphetamine. The final dispositional hearing was held before a visiting judge on CSB's motion for permanent custody as well as Father's alternative request for legal custody of both children. Following the hearing, the trial court terminated parental rights and placed J.A. and J.D.-A. in the permanent custody of CSB. Father appeals and raises one assignment of error.

II.

**ASSIGNMENT OF ERROR**

THE TRIAL COURT ERRED IN AWARDING PERMANENT CUSTODY TO [CSB] [AS IT] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶12}** Father's sole assignment of error is that the trial court's permanent custody judgment was not supported by the evidence presented at the hearing. He asserts that the trial court should have instead returned the children to his legal custody.

**{¶13}** Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

**{¶14}** In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶15} The trial court found that the first prong of the permanent custody test was satisfied because J.A. and J.D.-A. had been in the temporary custody of CSB for at least 12 months of a consecutive 22-month period. Father does not dispute that finding, which is supported by the record.

{¶16} According to R.C. 2151.414(B)(1), "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." J.A. and J.D.-A. were adjudicated neglected and dependent on June 10, 2022. Because 60 days after J.A.'s March 11 and J.D.A.'s March 15 removals were May 10 and May 14, earlier than the adjudication date, May 10 and 14 are the dates to be used in this time calculation. When CSB moved for permanent custody on June 9, 2023, each child had been in its temporary custody for more than 12 months of the prior consecutive 22 months.

{¶17} Next, the trial court was required to find that permanent custody was in the best interest of the children. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, their custodial history, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). None of the factors set forth in R.C. 2151.414(E)(7) through (11) are relevant to this case.

{¶18} Father purports to challenge the trial court's best interest determination, but he does not develop an argument under the best interest factors except to emphasize that both children

share a strong bond with him. The evidence was not disputed, however, that Father had not complied with the substance abuse or mental health components of the case plan and was not prepared to provide his children with a suitable home.

{¶19} By the time of the hearing, this case had been pending for almost two years. Throughout this case, Father's interaction with the children had been limited to supervised visitation because he did not stabilize his mental health or substance abuse problems. At the hearing, Father continued to insist that he did not suffer from paranoia or psychotic episodes, despite CSB presenting significant evidence to the contrary. Father was even cross-examined about certain evidence, including the conclusions of the police and Father's landlord, that Father had repeatedly reported crimes that did not actually occur. Father continued to deny that he suffered from delusions. He still insisted that people had drilled into his apartment walls in the middle of the night and that his neighbors and others were out to get him, despite the police and his landlord finding no evidence to support his claims.

{¶20} Moreover, approximately one month before the hearing, Father again tested positive for methamphetamine. Consequently, his level of drug treatment had again been increased and he had not yet completed that program or moved on to aftercare. Therefore, the evidence was clear that Father had not stabilized his mental health or substance abuse problems.

{¶21} The wishes of the children were expressed by the guardian ad litem, who reported that both boys also realized that Father was not able to provide them with a stable home. The guardian ad litem opined that permanent custody was in the children's best interest, emphasizing Father's unstable mental health and ongoing methamphetamine use. The older child, J.D.-A., was 17 years old, had one more year of high school, and was prepared to join the national guard. He expressed a desire to remain in Cousin's home until he graduated from high school.

**{¶22}** Although both boys were closely bonded to Father, the guardian ad litem explained that they continually worried about Father and had assumed roles more akin to his protectors than his minor children. The younger child worried so much about Father that he required institutionalization to address his increasing anxiety. After receiving ongoing mental health treatment in a residential facility, the younger child was doing well and would soon move to a therapeutic foster home. He realized that it was better for him not to return to Father's home.

**{¶23}** By the time of the hearing, these children had been in the temporary custody of CSB for almost two years. They had previously moved in and out of their parents' custody for several more years. Father was incarcerated for three years, Mother lost custody of them, and then they lived an unstable life with Father before this case began. Both children needed stability. Although the older child would soon be an adult, the younger child was not yet 14 years old, suffered from anxiety, and needed a secure permanent placement.

**{¶24}** Despite Father's expressed belief that he could provide the children with a safe and stable home, his untreated mental health and substance abuse problems prevented him from doing so. Cousin was not willing to assume legal custody of the children, but she was willing to keep J.D.-A. in her home until he emancipated. CSB had been unable to find another suitable relative who was willing to provide the children with a permanent home. Consequently, the trial court concluded that permanent custody would provide the children with a legally secure permanent placement.

**{¶25}** Given the evidence before the trial court, Father has failed to demonstrate that the trial court's permanent custody decision was against the manifest weight of the evidence. Father's assignment of error is overruled.

III.

{¶26} Father's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

—————

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

_____
JILL FLAGG LANZINGER
FOR THE COURT

SUTTON, P. J.
CARR, J.
CONCUR.

APPEARANCES:

ALAN M. MEDVICK, Attorney at Law, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and HEAVEN R. DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

MICHELE TOMER, Attorney at Law, for Mother.